UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Thurmond McMichael,

     Plaintiff,

     v.                             Civil Action No. 1:09-CV-130

Andrew Pallito, Robert Kupec,
Jay Simon, Phil Fernandez,
David Buley, Stan Morse,
Steven McCarthy, and Barbara
Lester,

     Defendants.

## **REPORT AND RECOMMENDATION**
### (Docs. 58 and 59)

Plaintiff Thurmond McMichael brings this action claiming that employees of the Vermont Department of Corrections ("DOC") violated his constitutional rights. McMichael was incarcerated in Vermont between September 2008 and February 2010. His complaint alleges that he was housed in a cell without heat or running water; that he was not provided a Muslim diet; that the DOC failed to report a hate crime perpetrated against him; and that he was improperly placed in "close custody."   Both McMichael and Defendants have now moved for summary judgment.   For the reasons set forth below, I recommend that Defendants' Motion for Summary Judgment be GRANTED in part and DENIED in part, and that McMichael's Motion for Summary Judgment be DENIED.

## **Factual Background**

In April 2008, McMichael was paroled to the State of Vermont from New York

after serving a sentence for sale of a controlled substance.   On September 6, 2008, he was charged with aggravated domestic assault and incarcerated at Chittenden Regional Correctional Facility ("CRCF").   On June 16, 2009, he was convicted and sentenced to a term of fourteen to eighteen months in prison.

On September 9, 2008, prior to his conviction in Vermont, McMichael was involved in an incident that, according to Defendants, resulted in an injury to a corrections officer.   A due process hearing was held, at which McMichael was found guilty of a Major DR ("Disciplinary Rule") violation and sentenced to five days in disciplinary segregation. McMichael claims that a second hearing was held, and Defendants report that the charge was subsequently reduced by the Superintendent from a Major A offense to a Major B offense.

On December 18, 2008, McMichael was transferred to Marble Valley Regional Correctional Facility ("MVRCF").   Upon his arrival at MVRCF, McMichael requested that he be placed in administrative segregation due, in part, to "hostility [he] was perceiving from correctional officers."   (Doc. 4 at 2.)   Defendants allege that during the intake process at MVRCF, McMichael declared that he had been in "real jails," that he "did not want to be bothered with this petty small jail shit," and that he therefore requested placement in high security.   (Doc. 59-6 at 1-2.)

A hearing with regard to McMichael's placement in administrative segregation was held on December 23, 2008.   Prison officials found that his continued detention in administrative segregation was not appropriate, and that he should instead be placed in less restrictive "close custody" due to his recent DR conviction.   (Doc. 59-8 at 3.)

2

McMichael claims that he had already served his sentence for the DR conviction, and that placement in close custody was an error.   (Doc. 58 at 5).

McMichael's placement in close custody was determined by a multi-factor calculation, utilizing a formula that assigned points for certain incidents, including assaults, prior felony convictions, and recent DRs.   (Doc. 59-9 at 1-4.)   This calculation was set forth in a Conviction and Violation Summary ("CVS"), and explained to McMichael in writing on January 9, 2009.   (Doc. 59-9 at 5.)   McMichael claims that the CVS was "doctored," and that his continued placement in close custody violated his rights. (Doc. 4 at 3.)

McMichael's second claim pertains to the conditions in his cell.   On January 7, 2009, he filed a grievance claiming that his cell had no heat and no water for seven days. His grievance form stated that the water had been fixed, but that the heat continued to be a problem.   (Doc. 59-10.)   On January 9, 2009, the DOC informed McMichael that his complaint had been forwarded to the maintenance department.   (*Id.*)   On January 17, 2009, McMichael filed another grievance about the lack of heat in his cell.   (Doc. 59-14.) He was again advised that the maintenance department was working on the heat issue throughout the entire facility.   (*Id.*)   McMichael complained about the lack of heat in a third grievance filed on January 21, 2009.   (Doc. 59-16.)   On February 4, 2009, the grievance investigator reported that "BGS has adjusted the temperatures in Echo Unit." (Doc. 59-18.)   In his Summary Judgment Motion, McMichael claims that he was subjected to freezing temperatures in his cell for fifty days.   (Doc. 58 at 5-6.)

McMichael also claims that he was denied a religiously-appropriate diet.   He

alleges that during the intake process at MVRCF, he informed prison personnel that he required a Muslim diet, but was nonetheless provided meals with pork for approximately three weeks.   On January 10, 2009, he submitted a grievance in which he asked to see an Imam regarding his request for a special diet.   (Doc. 59-13.)   On February 3, 2009, he submitted a subsequent grievance, explaining that while he was now receiving a special diet, vegetarian meals were not an adequate substitute for Muslim meals.   (Doc. 59-19.) In response, facility Assistant Superintendent Phil Fernandez wrote that "[y]ou have been served the alternative diet for meals which contain pork.   You are not on a vegetarian diet. When we spoke after yesterday's dinner, you seemed happy with the meal.   I will forward your request to central office for consideration."   (*Id.*)   On February 5, 2009, Fernandez further informed McMichael that "[b]ased upon your request for a religious diet, we will be ordering Halal meats.   This may take a few days to be delivered, but we will get them here as rapidly as possible."   (Doc. 59-20.)

On February 6, 2009, McMichael was transferred to Southern State Correctional Facility ("SSCF").   He claims that while at SSCF he filed two grievances regarding the events at MVRCF.   The DOC reports that there are no records of such grievances.   (Doc. 59 at 5.)   The DOC also informs the Court that prior to filing his instant complaint in May 2009, McMichael did not exhaust his administrative remedies – which would require appealing grievance denials to the DOC Commissioner – with respect to any of his current claims.   (Doc. 59-21 at 2.)

McMichael's final claim is that he was the victim of a hate crime while at MVRCF. His allegation reads as follows:

4

> Inmates in the cells around me were singing KKK songs and telling me that they were going to kill me because I was a "nigger."   They were calling me every racial epithet that I have ever heard; "Spook, Nigger, Coon, Tar baby, etc."   "Nigger" was my name to them.   Justin Jones kept telling me that he was "going to join the Aryan Nations and kill niggers – just for shits and giggles."

(Doc. 4 at 6.)   McMichael submitted a grievance about these incidents on January 7, 2009, but claims that no corrective action was taken.

On January 10, 2009, while returning to his cell from a shower, two inmates allegedly threw urine on him while calling him a "nigger."   (Doc. 4 at 6.)   McMichael became angry and began yelling, thus prompting two correctional officers to come to him. The officers then directed him to "lock-in," and declined his request to return to the shower to rinse off.   (*Id.*)   One of the officers allegedly returned an hour later and issued McMichael a DR.

McMichael subsequently asked several prison officials to report the incident to the State Police.   He alleges that no such report was filed, and that this failure was "a direct violation of DOC's own policies and directives to report all hate crimes as defined by 13 V.S.A. § 1455."   Defendants submit that they informed McMichael that "if it could be proven someone committed this act, the State Police would be contacted.   Moreover, if the assault occurred due to staff negligence, the individual staff members would be disciplined."   (Doc. 59-1 at 4, citing Doc. 59-12.)   The DOC subsequently informed McMichael that the inmate who allegedly threw urine at him had been "held accountable" and was no longer at the facility.   (Doc. 59-18.)

The parties have now filed cross-motions for summary judgment.   McMichael's

Motion essentially reiterates the allegations set forth in his complaint, with the addition of a series of exhibits and supporting case law.   Defendants argue that: they are immune in their official capacities from McMichael's claims for damages; that McMichael's remedies are limited because he has not alleged any physical injury; that the claims in the complaint do not establish sufficient personal involvement to establish their liability; that McMichael failed to exhaust his administrative remedies; that his claims do not rise to the level of Eighth Amendment violations; and that they (the Defendants) are entitled to qualified immunity.

## I.     Summary Judgment Standard

Summary judgment should be granted when the record shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).   In deciding the motion, the trial court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party, and decide whether a rational juror could decide in favor of that party under applicable law.   *Scott v. Harris*, 550 U.S. 372, 378 (2007).   To preclude summary judgment, the non-moving party must offer more than "mere speculation and conjecture[.]"   *Harlen Assoc. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001).   Furthermore, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).   In other words, only "disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment.   Factual disputes that are irrelevant or

unnecessary will not be counted."   *Id.* at 249.

This standard does not change when the parties file cross-motions for summary judgment.   In such cases, "the court 'must evaluate each party's motion on its own merits taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'"   *Bronx Household of Faith v. Bd. of Educ. of City of New York*, 492 F.3d 89, 96 (2d Cir. 2007) (quoting *Hotel Emp.s & Rest. Emp.s Union, Local 100 v. City of New York Dep't. of Parks and Recreation*, 311 F.3d 534, 543 (2d Cir. 2002)).

## II.    Official Capacity Immunity

In their Motion for Summary Judgment, Defendants contend that as current or former employees of the State of Vermont, they are immune from suit in their official capacities insofar as McMichael is seeking damages under 42 U.S.C. § 1983.   The Eleventh Amendment prohibits suits for damages brought in federal court against unconsenting states or state officials sued in their official capacities.   *See Edelman v. Jordan*, 415 U.S. 651, 663 (1974).   As the Supreme Court has explained, "an official-capacity suit against a state officer 'is not a suit against the official but rather is a suit against the official's office.   As such it is no different from a suit against the State itself.'"   *Hafer v. Melo*, 502 U.S. 21, 26 (1991) (quoting *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989)).

A state may waive its Eleventh Amendment immunity so long as the waiver is unequivocally expressed.   *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984).   Additionally, Congress may abrogate the Eleventh Amendment pursuant to Section 5 of the Fourteenth Amendment.   *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976).

7

Relevant to this case, Congress has not abrogated Vermont's sovereign immunity from a §

1983 suit in federal court.   *See Will*, 491 U.S. at 67.   Indeed, the Supreme Court has

specifically determined that Congress did not intend to override existing immunities such

as state sovereign immunity when it enacted § 1983.   *Id.*   As to the State of Vermont

itself, the Legislature has expressly preserved its sovereign immunity under the Eleventh

Amendment.   *See, e.g.*, 12 V.S.A. § 5601(g).   McMichael's claims for damages against

Defendants in their official capacities are therefore barred by the Eleventh Amendment,

and should be DISMISSED.

## III.   Available Remedies

Defendants next argue that if the Court finds a constitutional violation, McMichael

is limited to nominal damages.   Under the Prison Litigation Reform Act ("PLRA"), an

inmate who seeks to recover compensatory damages for a mental or emotional injury must

first establish that he has suffered a "physical injury."   *See* 42 U.S.C. § 1997e(e);

*Thompson v. Carter*, 284 F.3d 411, 417 (2d Cir. 2002).   A plaintiff is not required to show

physical injury in order to recover nominal or punitive damages, or to obtain declaratory

relief.   *Thompson*, 284 F.3d at 416.

McMichael's complaint does not allege any physical injuries aside from the

discomfort and emotional distress that resulted from his time in a cold cell, and weight loss

resulting from his inability to access a religiously-appropriate diet.   His allegations of a

hate crime and of improper placement in close custody are not alleged to have caused any

physical harm whatsoever.   Accordingly, McMichael is barred by the PLRA from

receiving compensatory damages.   *See* 42 U.S.C. § 1997e(e); *Pearson v. Wellborn*, 471

F.3d 732, 744-45 (7th Cir. 2006) (plaintiff's testimony of mental and physical depression and 50-pound weight loss did not establish physical injury).

As to the question of punitive damages, such damages may be awarded under § 1983 when "'the defendant's conduct is shown to be motivated by an evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Disorbo v. Hoy*, 343 F.3d 172, 186 (2d Cir. 2003) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)).   In this case, there is no evidence of such intent or indifference by Defendants.   First, on the issue of lack of heat, the problem appears to have been facility-wide and was ultimately fixed.   As to his requests for an appropriate diet, McMichael was first offered pork-free meals, and subsequently ordered special Halal meats.   With regard to the "hate crime" incident, he was informed that the inmate who threw urine at him had been disciplined and was no longer in the facility.   Finally, McMichael's claim that he was wrongfully placed in close custody offers only conclusory allegations of malice; specifically, that the documentation supporting his placement was "doctored."   *See Anderson*, 477 U.S. at 256-57 (conclusory statements do not create genuine issue for trial); *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002) (same). Accordingly, even when viewed in a light most favorable to the non-movant, none of these facts supports an award of punitive damages, and McMichael's request for such an award should be DISMISSED as a matter of law.

## IV.   Personal Involvement

Defendants argue that the claims brought against them in their individual capacities should be dismissed because McMichael has failed to show that they were personally

involved in any alleged wrongdoing.   It is well established that in order to state a claim for

relief under Section 1983, a plaintiff must allege the personal involvement of a defendant

in the purported constitutional deprivation.   *Farid v. Ellen*, 593 F.3d 233, 249 (2d Cir.

2010) (quoting *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006)).   To the extent that a

defendant was allegedly involved in a supervisory capacity, personal involvement may be

established by evidence of either direct participation or of the defendant's "(1) failure to

take corrective action after learning of a subordinate's unlawful conduct, (2) creation of a

policy or custom fostering the unlawful conduct, (3) gross negligence in supervising

subordinates who commit unlawful acts, or (4) deliberate indifference to the rights of

others by failing to act on information regarding the unlawful conduct of subordinates."

*Hayut v. State Univ. of New York*, 352 F.3d 733, 753 (2d Cir. 2003).   The law is clear that

"[a]n individual cannot be held liable for damages under Section 1983 'merely because he

held a high position of authority . . . .'"   *Back v. Hastings on Hudson Union Free School

Dist.*, 365 F.3d 107, 127 (2d Cir. 2004) (quoting *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir.

1996)).

McMichael's complaint names eight Defendants, many of whom were supervisors.

The most senior of these is Andrew Pallito, Commissioner of the Vermont Department of

Corrections.   The claims against Commissioner Pallito are that McMichael sent him

grievance appeals informing him of allegedly unconstitutional conduct.   There is no

evidence in the record that Commissioner Pallito ever personally reviewed McMichael's

appeals, or that he provided any sort of response.   (Doc. 4 at 3-6.)

It has been held that a prison official who receives a letter or grievance alleging

10

misconduct is not, merely by receiving such notice, "personally involved" for purposes of Section 1983 liability. *See Bryant v. County of Monroe*, 2010 WL 4877799, at *3 (W.D.N.Y. Nov. 22, 1010) (citations omitted); *Smart v. Goord*, 441 F. Supp. 2d 631, 643 (S.D.N.Y. 2006). Indeed, in *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009), the Supreme Court rejected the argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." Consequently, allegations that grievance appeals were sent to the Commissioner do not, standing alone, render the Commissioner liable for alleged constitutional violations. The claims against Commissioner Pallito should therefore be DISMISSED.

The same analysis applies to Defendant Robert Kupec, who is alleged to have been the Facilities Executive for all DOC facilities in Vermont. Like the Commissioner, Kupec is claimed to have received notice of everything that happened at MVRCF, but provided "no response." (Doc. 4 at 5.) Again, mere notice of violations is insufficient for supervisor liability, and all claims against Defendant Kupec should be DISMISSED. *See Ashcroft*, 129 S. Ct. at 1949.

As to the remaining Defendants, however, a personal involvement defense is not appropriate. Defendant Jay Simons was the Superintendent at MVRCF, and is alleged to have corresponded directly with McMichael on the question of close custody confinement. (Doc. 4 at 3.) McMichael also claims that he asked Superintendent Simons to report the alleged "hate crime" to State Police. (*Id.* at 6.) Defendant Phil Fernandez, as the facility's Assistant Superintendent, is claimed to have had several communications with McMichael with respect to close custody, the heat issue, the availability of a Muslim diet,

11

and the "hate crime" incident.   (*Id.* at 3-6.)

Defendant Stan Morse is alleged to have "doctored" the CVS form.   (*Id.* at 3.)

Defendant David Buley is claimed to have erroneously classified McMichael as close

custody.   (*Id.* at 2.)   Defendant Steven McCarthy is alleged to have treated McMichael

unfairly during the "hate crime" incident (*id.* at 6), and McMichael claims that Barbara

Lester, Food Service Supervisor at MVRCF, failed to provide him with proper meals.   (*Id.*

at 5.)   Notwithstanding the fact that these Defendants may have all acted lawfully in all

respects, their personal involvement is not contested.

Furthermore, Defendants' argument that the alleged events had all passed, and thus

could no longer be remedied, is not entirely accurate.   The heating issue was allegedly a

problem even after grievances were filed.   The religiously-appropriate diet issue also

continued beyond the date of the initial grievance.   Finally, McMichael's contention that

the State Police should have been notified of a hate crime was never addressed as

requested.   The Court should thus decline to grant these latter Defendants summary

judgment on the ground that they were not personally involved.

## V.    Exhaustion of Administrative Remedies

Defendants next argue that McMichael failed to appeal his grievances to the

Commissioner, and therefore failed to exhaust his administrative remedies as required by

the PLRA, 42 U.S.C. § 1997e(a).   To support their claim, Defendants have submitted an

affidavit from John Murphy, the DOC's Grievance Coordinator.   (Doc. 59-21.)   Murphy

explains that the DOC keeps a database of all "grievance appeals that are sent to executives

in the Department's central office," and that there is no record of any such appeals having

been filed prior to the date of the complaint "concerning the matters of which [McMichael] complains in this lawsuit." (*Id.* at 2.)

McMichael, however, has submitted copies of three such appeals. (Doc. 58-12 at 1-3.) The first, though difficult to read because of the quality of the copy, appears to be dated March 2009 and pertains to the lack of a Muslim meal. (*Id.* at 1.) The second, clearly dated March 7, 2009, complains about the temperature in McMichael's cell. (*Id.* at 2.) And the third, dated March 6, 2009, cites the urine-throwing incident. Viewing the facts in a light most favorable to the non-moving party, it thus appears that there is at least a question of fact about whether there was exhaustion on these issues. I therefore recommend that summary judgment on the basis of a failure to exhaust administrative remedies be DENIED.

## VI.   Constitutional Violations

Moving to the substance of McMichael's claims, Defendants contend that his treatment did not violate his constitutional rights. Specifically, they argue that McMichael's allegations do not amount to a violation of the Eighth Amendment. Although not addressed by Defendants, the first question is whether McMichael's treatment should be analyzed under the Eighth Amendment, or whether, as a pretrial detainee, he was protected by the Due Process Clause of the Fourteenth Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979).

McMichael was taken into DOC custody in September 2008. He was convicted and sentenced in June 2009. The complaint in this case was filed in May 2009. Consequently, all relevant events occurred prior to McMichael's conviction.

McMichael's status is complicated by the fact that he was also being held for a parole violation.   As the Fifth Circuit has explained, "[u]nlike the typical pretrial detainee, the justification for the detention of a detained parolee is dual . . . .   [T]he detention and subsequent reincarceration of a parolee are only *triggered* by the new arrest; the detention and subsequent reincarceration are *justified* by the prior conviction."   *Hamilton v. Lyons*, 74 F.3d 99, 106 (5th Cir. 1996).   "In other words, when a parolee is returned to prison because of a parole violation, the detention is justified *both* by his or her prior conviction and existing prison sentence, *and* his or her subsequent parole violation."   *Towsley v. Frank*, 2010 WL 5394837, at *6 (D. Vt. Dec. 28, 2010).   It is therefore certainly arguable that because McMichael was incarcerated for a parole violation, which in turn was based upon a prior conviction, the Eighth Amendment applies.

The Eighth Amendment prohibits cruel and unusual punishment.   Prohibited punishment includes that which "involve[s] the unnecessary and wanton infliction of pain. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).   In the prison context, the U.S. Supreme Court has stated that while "the Constitution does not mandate comfortable prisons," *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981), the conditions of prison confinement must be at least "humane."   *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).

In order to establish a constitutional violation, a prisoner must satisfy a two-prong test comprised of both an objective and subjective elements.   *See Farmer*, 511 U.S. at 834. To satisfy the objective prong, a "plaintiff must demonstrate that the conditions of his confinement result in unquestioned and serious deprivations of basic human needs" or deprived him "of the minimal civilized measure of life's necessities.   *Anderson v.*

14

*Coughlin*, 757 F.2d 33, 34-35 (2d Cir. 1985).   A denial of basic human needs includes food, clothing, shelter, medical care, reasonable safety, or exposure to conditions that pose an unreasonable risk of serious damage to prisoner's future health.   *See Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002).

The subjective element requires a plaintiff to show that the prison official acted with a "sufficiently culpable state of mind."   *Farmer*, 511 U.S. at 834.   That state of mind is one of "deliberate indifference," which requires more than negligence but less than conduct undertaken for the very purpose of causing harm.   *Id.* at 835.   In order for a prison official to act with deliberate indifference, he must know of and disregard an excessive risk to an inmate's health or safety.   *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994).   The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Id.*

### A.    Lack of Running Water

Defendants first address McMichael's claim of a lack of adequate water. Objectively, a lack of running water for a one week period does not violate the Eighth Amendment.   *See, e.g., Johnson v. Comm'r of Corr. Servs.*, 699 F. Supp. 1071, 1074 (S.D.N.Y. 1988) (plaintiff confined for one week in a cell with an inoperable sink did not suffer a Constitutional violation because he was provided drinks with meals).   McMichael does not claim that he was deprived of water entirely, that he was denied adequate bathroom or shower facilities, or that he suffered any harm as a result of the fact that he had no running water in his cell.   *See James v. Monroe County Jail*, 2005 WL 2030730, at *3

(W.D.N.Y. Aug. 23, 2005) (lack of access to running water, by itself, does not violate the Constitution).   Defendants are therefore entitled to summary judgment on this claim.

**B.    Cold Temperatures**

McMichael's allegations about cold temperatures in his cell present a closer question.   His Motion for Summary Judgment describes "freezing temperatures in the months of December and January in the State of Vermont."   (Doc. 58 at 5.)   In his complaint, he claims that he could see his breath.   (Doc. 4 at 4.)   In order to keep warm, he alleges that he "had to remain fully dressed and keep my coat and blankets wrapped around me at all times, including keeping my shoes on when sleeping."   (*Id.*)

Exposing inmates to severe cold for prolonged periods of time can be "a serious deprivation within the ambit of the Eighth Amendment."   *Thompson v. Carlsen*, 2010 WL 3584409, at *9 (N.D.N.Y. Aug. 15, 2010); *see also Gaston v. Coughlin*, 249 F.3d 156, 165 (2d Cir. 2001).   Here, viewing the facts in a light most favorable to McMichael, there is little information about the temperature in his cell aside from his subjective description of the conditions as "freezing" and the fact that he could allegedly see his breath. McMichael also states that prison officials allowed him a coat and blankets so that he could try to keep himself warm while the problem was being addressed.

From an objective perspective, McMichael's treatment does not appear to have deprived him of the "minimal civilized measures of life's necessities."   *Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir. 1999); *see, e.g., Trammel v. Keane*, 338 F.3d 155, 158-59, 164-65 (2d Cir. 2003) (affirming summary judgment for defendants where plaintiff claimed he was exposed to "bitter cold" and only allowed one pair of undershorts

for 17 days); *Brown v. McElroy*, 160 F. Supp. 2d 699, 706 (S.D.N.Y. 2001) (confining INS detainee in a cold room for a prolonged time period did not meet the objective criteria for an Eighth Amendment violation because he was able to get some warmth with blankets, and provide himself with livable conditions).   As the Second Circuit stated in *Trammel*, while there is "no doubt that [plaintiff] was made uncomfortable . . . , there is simply no factual dispute regarding whether the temperature in his cell posed a threat to this 'health or safety' of the sort that would disallow summary judgment in his favor."   338 F.3d at 164-65 (distinguishing cases in which guards intentionally removed plastic sheeting that was covering broken windows, allowed cells to get so cold that water in toilets was freezing, and removed inmate clothing and opened windows in mid-winter).

Nor do McMichael's allegations satisfy the Eighth Amendment's subjective element.   Within two days of filing his grievance about the heat issue, he was informed that his complaint had been forwarded to the maintenance department.   Shortly thereafter, he was informed that the problem was being addressed through the entire facility.   Less than one month after filing his initial grievance on the issue, the temperature in his cell had been adjusted.   These responses do not evidence "deliberate indifference" as required for an Eighth Amendment violation.   *See Thompson v. Carlsen*, 2010 WL 3584409, at *11 (granting summary judgment where plaintiff did not know if heat was turned off intentionally, and officer in his dormitory made efforts to get heat fixed).   Defendants should therefore be granted summary judgment on this claim.

### C.   Muslim Diet

Defendants also argue that their response to McMichael's requests for a

17

religiously-appropriate diet did not violate his Eighth Amendment rights.   This argument is misplaced, as religious diet claims are analyzed under the First Amendment.   *See Ford v. McGinnis*, 352 F.3d 582, 597 (2d Cir. 2003).   The Eighth Amendment requires that prisoners be provided "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it."   *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983) (internal citations omitted).   It is the First Amendment, however, that requires a diet consistent with an inmate's "religious scruples."   *Ford*, 352 F.3d at 597.   "Courts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights."   *McEachin v. McGuinnis*, 357 F.3d 197, 203 (2d Cir. 2004).

The test for a First Amendment violation has multiple steps.   First, the party asserting the claim must establish that the defendants' conduct infringed on his or her sincerely held religious beliefs.   *Salahuddin v. Goord*, 467 F.3d 263, 274-75 (2d Cir. 2006).   Once a plaintiff has made this showing, the burden then shifts to the defendants to identify a legitimate penological purpose justifying the decision under scrutiny.   *Id.* at 274-75.   In the event such a penological interest is articulated, its reasonableness is then subject to analysis under the test set out by the Supreme Court in *Turner v. Safley*, 482 U.S. 78 (1987), which essentially examines the penological concerns underlying the alleged refusal to provide the requested diet.   *See Johnson v. Guiffere*, 2007 WL 3046703, at *5-*6 (N.D.N.Y. Oct. 17, 2007).   Defendants have not offered any analysis on these points.   Indeed, their memorandum makes no reference to a First Amendment right to a

18

religiously-appropriate diet.   The Court should therefore decline to grant Defendants summary judgment on McMichael's religious diet claim.

### D.   Close Custody

Defendants further argue that they explained to McMichael the basis for his close custody confinement, and that in any event, they are entitled to qualified immunity for his placement.   The Court need not address the qualified immunity argument, as the undisputed facts do not display a constitutional violation.

McMichael's claim of a constitutional violation is based upon his allegation of a "doctored" CVS form.   On January 9, 2009, Stan Morse provided McMichael with a detailed explanation of the custody calculation set forth in the CVS.   Morse's explanation appears consistent with the evidence presented to the Court about McMichael's disciplinary history.   (Doc. 58-7 at 5.)   The form classifies McMichael at a custody level of "4A."   (*Id.* at 1.)

In support of his claim, McMichael submits an exhibit that he has labeled "Real CVS," which classifies him at a custody level of "3A."   (Doc. 58-8.)   That document, however, was completed two months after the allegedly "doctored" CVS, and thus registered lower scores with respect to McMichael's recent disciplinary history.   Indeed, the "Real CVS" is entirely consistent with Morse's note to McMichael on the first CVS, in which he explained that McMichael would "reduce to medium [security] on 3/9/09 six months from your B#5 DR."   (Doc. 58-7 at 1.)   Consequently, the document labeled "Real CVS" does not support McMichael's claim that he was wrongfully classified, and his claim of a "doctored" form is unsupported.   *See Anderson*, 477 U.S. at 256-57

19

(conclusory statements do not create genuine issue for trial).   The Court should therefore

grant Defendants summary judgment on this claim.

E.     **Hate Crime**

Defendants submit that their "refusal to report the alleged hate crime to the Vermont

State Police does not violate any of Mr. Michael's rights."   (Doc. 59 at 11.)   They further

contend that "Mr. Michael was given the opportunity to report the crime himself."   (*Id.*)

The undisputed facts show that the inmate who threw urine at McMichael was disciplined

and removed from the facility.

The Court agrees that the failure to report a hate crime does not violate any

established constitutional right.   Specifically, McMichael's claim that the failure to report

the hate crime violated DOC's "own policies and directives" does not rise to the level of a

constitutional violation.   *See, e.g., White v. Fischer*, No. 9:09-CV-240, 2010 WL 624081,

at *5 (N.D.N.Y. Feb. 18, 2010) (stating that "state regulations, including DOCS Directives,

do not ordinarily confer constitutional rights").   As to his contention that the DOC failed

to investigate his claim, and notwithstanding the fact that the perpetrator was eventually

found and punished, "the law is clear . . . that inmates do not enjoy a constitutional right to

an investigation of any kind by government officials."   *Martin v. Patterson*, 2010 WL

3033796, at *4 (N.D.N.Y. July 16, 2010) (citing *Bernstein v. New York*, 591 F. Supp. 2d

448, 460 (S.D.N.Y. 2008).   Defendants should therefore be granted summary judgment on

this claim.[1]

### F.   Fourteenth Amendment Analysis

If the Court determines that, notwithstanding McMichael's detention as a parole

violator, he was entitled to the protections of the Fourteenth Amendment, the result at

summary judgment should be the same.   It has long been held that, in contrast to a

sentenced prisoner, whose conditions of confinement are analyzed under the Cruel and

Unusual Punishment Clause of the Eighth Amendment, "the proper inquiry [for a pretrial

detainee] is whether conditions [of confinement] amount to punishment of the detainee"

under the Due Process Clause of the Fourteenth Amendment.   *Bell v. Wolfish*, 441 U.S.

520, 535 n.16 (1979).

The Court first reviews McMichael's close custody claim.   Under the Due Process

Clause, "[a]s a general rule, conditions of confinement imposed in pretrial detention do not

give rise to a violation of a prisoner's due process rights unless they are punitive."

*Palacio v. Pagan*, 345 F. App'x 668, 669 (2d Cir. 2009 ) (citing *Bell*, 441 U.S. at 535).

"Not every disability imposed during pretrial detention amounts to 'punishment' in the

constitutional sense . . . ."   *Bell*, 441 U.S. at 537.   To the extent that a detention is

non-punitive, it is generally accepted "that 'the transfer of an inmate to less amenable and

more restrictive quarters for nonpunitive reasons' is not a right protected by the due

process clause itself."   *Covino v. Vermont Dep't of Corr.*, 933 F.2d 128, 129 (2d Cir.

---

1   Defendant Steven McCarthy, a correctional officer at MVRCF, is alleged to have ordered
McMichael to "lock down" immediately after the urine-throwing incident, and to have issued McMichael a
DR.   McMichael does not allege that these actions violated any federal rights.   Indeed, McMichael's legal
claims in this portion of the complaint focus on the failure of DOC supervisors to report and investigate the
incident.   (Doc. 4 at 6.)   Any claims brought against McCarthy should therefore be DISMISSED.

1991) (quoting *Hewitt*, 459 U.S. at 466).

Non-punitive classification decisions are often referred to as "administrative." *See, e.g., Hewitt*, 459 U.S. at 468; *Sher v. Coughlin*, 739 F.2d 77, 81 (2d Cir. 1984).   An example of administrative classification would be the separation of a "potentially disruptive groups of inmates."   *Walker v. Shaw*, 2010 WL 2541711, at *4 (S.D.N.Y. June 23, 2010)).   Such classification decisions are within the "'full discretion'" of prison officials, "and prisoners have 'no legitimate statutory or constitutional entitlement sufficient to invoke due process' in connection with such conditions [of confinement]." *Walker*, 2010 WL 2541711, at *4 (quoting *Pugliese v. Nelson*, 617 F.2d 916, 923 (2d Cir. 1980)).

Here, there is no indication that McMichael's placement in close custody was punitive.   In fact, he requested placement in administrative confinement, but was instead placed in less-restrictive close custody based upon the DOC's points system.   The Court does not question the legitimacy of using such a system, and McMichael does not challenge the system's underlying merit.   Any claim that the DOC intentionally "doctored" the CVS is, as explained above, unsupported, and the Court finds no other basis for concluding that close custody confinement violated McMichael's due process rights.

Similarly, there is no suggestion in the record that either the water or heat issues were punitive in nature.   The water problem was fixed promptly, and the heat problem was facility-wide, thereby dispelling any theory that a deprivation of heat was in some way intended as punishment.   The "hate crime" perpetrator was disciplined, and McMichael does not allege any sort of due process or other constitutional violation arising out of that

22

incident.   This leaves the religious diet issue, which requires a First Amendment analysis and should not be dismissed at this time.   Therefore, again, the result under a Fourteenth Amendment is the same — with respect to all claims — as that reached when applying an Eighth Amendment standard.

### G.   Conclusion Re: Defendants' Summary Judgment Motion

For these reasons, I recommend that Defendants' Motion for Summary Judgment be GRANTED in part and DENIED in part.   Specifically, all claims for damages against Defendants in their official capacities should be DISMISSED.   Because McMichael has failed to demonstrate a physical injury, all claims for compensatory damages should also be DISMISSED.   Further, any claims for punitive damages should be DISMISSED as a matter of law.

All claims brought against Defendants Pallito and Kupec in their individual capacities should be DISMISSED for lack of personal involvement.   McMichael's claims relating to the lack of running water, the lack of adequate heat, his placement in close custody, and the DOC's alleged failure to report and investigate a hate crime should also be DISMISSED.   Defendants' Motion for Summary Judgment should otherwise be DENIED.

## VII.   McMichael's Summary Judgment Motion

McMichael has filed his own Motion for Summary Judgment.   (Doc. 58.) Because Defendants are entitled to summary judgment on certain claims as set forth above, McMichael's Motion should be DENIED with respect to those claims.   As to the remaining issue in the case — that of access to a religiously-appropriate diet—

McMichael's Motion does not include a statement of undisputed facts as required by Local Rule 56(a), and should therefore be DENIED without prejudice.

## Conclusion

For the reasons set forth above, I recommend that Defendants' Motion for Summary Judgment (Doc. 59) be GRANTED in part and DENIED in part.   Specifically, all claims for damages against Defendants in their official capacities should be DISMISSED. Because McMichael has failed to demonstrate a physical injury, all claims for compensatory damages should also be DISMISSED.   Further, the Court should find that there is no basis for an award of punitive damages, and that claims for such damages should be DISMISSED as a matter of law.

All claims brought against defendants Pallito and Kupec in their individual capacities should be DISMISSED for lack of personal involvement.   McMichael's claims relating to the lack of running water, the lack of adequate heat, his placement in close custody, and the DOC's failure to report and investigate a hate crime should also be DISMISSED.   Defendants' Motion for Summary Judgment should otherwise be DENIED.

McMichael's Motion for Summary Judgment (Doc. 58) should be DENIED as to all claims to which Defendants are entitled to summary judgment, and with respect to the one remaining claim in the case, should be DENIED without prejudice.   If the Court adopts this Report and Recommendation, I further recommend that the parties be granted 30 days in which to file for summary judgment on the sole remaining claim: the question of McMichael's access to a religiously-appropriate diet.

24

Dated at Burlington, in the District of Vermont, this 27th day of January, 2011.


/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge


Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2), 6(a), 6(d); L.R. 72(c).   Failure to timely file such objections operates as a waiver of the right to appellate review of the District Court's adoption of such Report and Recommendation.   *See* Fed. R. Civ. P. 72(a); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).