UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Thurmond McMichael,

    Plaintiff,

    v.                                    Civil Action No. 1:09-CV-130

Andrew Pallito, Robert Kupec,
Jay Simon, Phil Fernandez,
David Buley, Stan Morse,
Steven McCarthy, and Barbara
Lester,

    Defendants.

## REPORT AND RECOMMENDATION
(Docs. 83, 84 and 87)

       Plaintiff Thurmond McMichael, proceeding *pro se*, brings this action claiming that employees of the Vermont Department of Corrections ("DOC") violated his constitutional rights while he was incarcerated.  In a prior summary judgment ruling, the Court dismissed all but one claim: the allegation that Defendants had failed to provide McMichael with a religiously-appropriate diet.  (Docs. 65 and 78.)  Defendants have now moved for summary judgment on that claim, and McMichael has opposed the motion.

       For the reasons set forth below, I recommend that Defendants' motion for summary judgment be GRANTED, and that this case be DISMISSED.

## Factual Background

       The following facts are undisputed unless otherwise indicated.  On September 6, 2008, McMichael was charged with aggravated domestic assault.  On November 8, 2008,

while incarcerated at Chittenden Regional Correctional Facility ("CRCF"), he submitted an Inmate Request for Religious Diet/Alternative (Vegetarian) Meal, specifically requesting a "no pork" diet.  (Doc. 83-4 at 1.)   The request was approved, and McMichael states in his opposition memorandum that he received a "very good religious diet" while at CRCF.  (Doc. 87 at 7.)

On December 18, 2008, McMichael was transferred to Marble Valley Regional Correctional Facility ("MVRCF").   DOC regulations at the time required that when an inmate was transferred to a new facility, it was the "inmate's responsibility to notify food services staff that he was receiving a religious diet at a previous facility."   (Doc. 83-3 at 6.) The DOC has no evidence of McMichael requesting a religious diet at that time, and Defendants report that "[a]ny diet request[s] approved while he was housed at Chittenden Regional Correctional Facility were not reflected in his core file when he arrived at Marble Valley, so no one at Marble Valley knew that Mr. McMichael was expecting the alternative religious diet."   (Doc. 83-2 at 3.)[1]

Defendants also submit that during the admission process at MVRCF, McMichael became agitated and combative and had to be placed in a holding cell.  (Doc. 83-2 at 2.) McMichael claims that during this process, he informed Correctional Officer ("CO") Rosario of his need for a Muslim diet, and that CO Rosario "wrote this information down." (Doc. 87 at 2.)   The document that McMichael references for support does not mention a

---

[1] It appears from the DOC regulations in force at the time that a copy of the CRCF approval should have been placed in McMichael's core file and documented in electronic case notes.   (Doc. 83-3 at 5, 6.)

2

dietary request. (Docs. 59-6, 87-12.)

On January 10, 2009, McMichael filed an informal complaint requesting a "Muslim meal" and access to an Imam. (Doc. 83-5.) The affidavit of Philip Fernandez, former Assistant Superintendent (and now Superintendent) at MVRCF, states that once McMichael filed his informal complaint, he "was allowed to fill out the religious diet request and was placed on a pork free diet." (Doc. 83-2 at 3.) The religious diet request was submitted on January 28, 2009, and asked that McMichael receive pork-free, Muslim meals. (Doc. 83-7.)

On January 23, 2009, prior to submitting his written diet request, McMichael filed a formal grievance complaining about several conditions of his confinement, including the alleged failure to allow him to "see an Imam and get a muslim meal." (Doc. 83-6.) On February 3, 2009, he filed a second grievance complaining that pork-free meals did not constitute a Muslim diet. (Doc. 83-9.) On February 4, 2009, the DOC replied to the first grievance and informed McMichael that MVRCF had tried to contact an Imam "to no avail." The response also stated that McMichael was being served the pork-free diet. (Doc. 83-8.) The response was signed by Fernandez as the "Investigator." (*Id.*)

Fernandez attests in his affidavit that he met with McMichael on February 4, 2009 to address the concern that McMichael was not being served a religiously-appropriate diet. The affidavit states that "[d]uring this conversation, we had our first discussion of 'Halal' meats. I explained that I would need to check with Central Office over the availability of such meats." (Doc.83-2 at 3.) On February 5, 2009, Fernandez responded to McMichael's request in writing, informing him that "we will be ordering Halal meats.

3

This may take a few days to be delivered, but we will get them here as rapidly as possible." (Doc. 83-10.)

The parties agree that McMichael and Fernandez spoke several times about McMichael's diet while he was at MVRCF.  McMichael's summary judgment filings imply that some of these conversations pre-dated his January 10, 2009 informal complaint. Fernandez allegedly responded that while a pork-free diet was being provided, he would "look into" McMichael's concerns.  (Doc. 87 at 2, 8); (Doc. 87-1 at 2).  In his verified Complaint, McMichael alleges that he met with Fernandez on January 12, 2009, and informed him that a "no pork" diet was not the same as a Muslim diet, and his food needed to be prepared with utensils that had not been used previously to cook pork.  (Doc. 4 at 5.)[2] Fernandez reportedly told McMichael that he would contact an Imam and forward McMichael's request to meet with him.  A "Plan for Resolution," signed by McMichael that same day, indicated that he would be receiving a "no pork diet."  (Doc. 83-5.)

Fernandez states in his affidavit that "[a]t that time, based on my experience with previous requests, I understood a 'muslim meal' to be a pork free meal."  (Doc. 83-2 at 2.) He further explains that prior to 2008, the DOC did not have a "formalized process in accommodating the needs of muslim inmates," and that he personally had "rarely

---

[2] A verified complaint may serve as an affidavit for summary judgment purposes.  *Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000). Here, McMichael "affirmed" that his complaint was "true and correct" and based upon his personal knowledge, elevating the document to a verified complaint.  (Doc. 7 at 7.)  The Court will consider it as an affidavit for the purposes of summary judgment.

4

processed a request for a 'muslim meal.'"  (*Id.*)[3]  "The Department's dietary offerings at that time included a standard fare offering which included pork, a vegetarian offering which included no meat of any kind, and a common fare offering that included meats other than pork.  The Department's request form for religious diets did not specify Halal meats as part of its religious diet."  (*Id.* at 2.)

McMichael was transferred from MVRCF to Southern State Correctional Facility ("SSCF") on February 6, 2009.  There are no allegations in the Complaint regarding meals provided to McMichael at SSCF.  McMichael does claim that while at SSCF he filed two grievances concerning the events at MVRCF.  The DOC contends that there are no records of such grievances.  (Doc. 59 at 5.)

## Discussion

**I.   Summary Judgment Standard**

Summary judgment should be granted when the record shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  In deciding the motion, the trial court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party, and decide whether a rational juror could decide in favor of that party under applicable law.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).  To preclude summary judgment, the non-moving party must offer more than "mere speculation and conjecture[.]"  *Harlen Assoc. v. Inc. Vill. of Mineola*,

---

[3] Fernandez explains that "[a]s of November 2008, the Vermont Department of Corrections was in the process of updating its policies on religious practices and special dietary requirements.  On July 27, 2010, the Department promulgated an interim directive on Inmate Alternative Diets after approximately two years of working on revisions."  (Doc. 83-2 at 1.)  He also states that procedures for ensuring that transferred inmates continue to receive appropriate meals "are much more routinized now than in late 2008 to early 2009."  (*Id.*)

5

273 F.3d 494, 499 (2d Cir. 2001). Furthermore, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In other words, only "disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 249.

## II.    First Amendment Claim

The Second Circuit has "clearly established that a prisoner has a right to a diet consistent with his or her religious scruples." *Ford v. McGinnis*, 352 F.3d 582, 597 (2d Cir. 2003); *Kahane v. Carlson*, 527 F.2d 492, 495-96 (2d Cir. 1975). Therefore, to "deny prison inmates the provision of food that satisfies the dictates of their faith . . . unconstitutionally burden[s] their free exercise rights." *McEachin v. McGuinnis*, 357 F.3d 197, 203 (2d Cir. 2004). Those rights, however, must be balanced "against . . . the interests of prison officials charged with complex duties arising from administration of the penal system.'" *Ford*, 352 F.3d at 588 (quoting *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990)). Accordingly, an inmate retains First Amendment rights "that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974).

The usual test for a First Amendment violation has multiple steps. First, the party asserting the claim must establish that the defendants' conduct infringed on his or her sincerely held religious beliefs. *Salahuddin v. Goord*, 467 F.3d 263, 274-75 (2d Cir.

6

2006).[4]  Once a plaintiff has made this showing, the burden shifts to the defendants to identify a legitimate penological purpose justifying the decision under scrutiny.  *Id.* at 274-75.  In the event such a penological interest is articulated, its reasonableness is then subject to analysis under the test set out by the Supreme Court in *Turner v. Safley*, 482 U.S. 78 (1987), which essentially examines the penological concerns underlying the alleged refusal to provide the requested diet.  *See Johnson v. Guiffere*, 2007 WL 3046703, at *5-*6 (N.D.N.Y. Oct. 17, 2007).  The Supreme Court has noted that this "reasonableness" test is "less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights."  *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987).

In this case, the parties do not dispute whether McMichael required a Muslim diet as part of a sincerely held religious belief.  Nor was he refused such a diet.  Instead, McMichael claims that the "no pork" diet initially provided him was inconsistent with his religious needs, and that the eventual provision of special meats was unlawfully delayed. *See, e.g., McEachin*, 357 F.3d at 201 (holding that an intentional, seven-day deprivation of religious meals could be actionable under the First Amendment.)

---

[4]  The Second Circuit has applied the "substantial burden" test in its most recent prison free exercise cases, though it has explicitly refused to adopt or endorse the test.  "The *Ford* court noted that the Circuits apparently are split over whether prisoners must show a substantial burden on their religious exercise in order to maintain free exercise claims.  Nevertheless, the *Ford* court held that since the plaintiff had not challenged the application of the substantial burden requirement, the court would proceed as if the requirement applied.  Likewise, the *Salahuddin* court noted that '[r]esolution of this appeal does not require us to address Salahuddin's argument that a prisoner's First Amendment free-exercise claim is not governed by the 'substantial burden' threshold requirement,' because defendants 'never proceed to argue that we should find any particular burdened religious practice to be peripheral or tangential to [plaintiff's] religion.' The court then proceeded as if the substantial burden requirement applied."  *Pugh v. Goord*, 571 F. Supp. 2d 477, 497 n.10 (S.D.N.Y. 2008) (citations and some punctuation omitted).  Because the "substantial burden" test has not been adopted by the Circuit, the Court will not directly address the question of whether a "no pork" diet, absent Halal meats, substantially burdened McMichael's ability to exercise his religious rights.

Defendants assert that "[t]he delay in this case is due primarily to McMichael's failure to timely notify Department staff that he desired a religious meal." (Doc. 83 at 7.) They rely upon the DOC's written records, arguing that McMichael first notified MVRCF of his need for a religious diet in his informal complaint on January 10, 2009, and then through his religious diet request on January 28, 2009. Defendants also contend, that McMichael did not mention Halal meats until February 4, 2009.

Defendants ultimately argue that the DOC's administrative procedures – presumably including the requirement that religious diet requests be set forth in writing – are reasonably related to legitimate penological interests, and that short delays resulting from such procedures do not substantially burden religious rights. (Doc. 83 at 6-7) (citing *Davidson v. Murray*, 2005 WL 1123756, at *3 (W.D.N.Y. May 10, 2005) (concluding that eight day delay in responding to Kosher diet request did not violate Free Exercise Clause)); *see also Holiday v. Giusto*, 2004 WL 1792466, at *5 (D. Or. Aug. 10, 2004) (18-day delay in processing Muslim plaintiff's request for religious diet did not violate Free Exercise Clause), *report and recommendation adopted*, 2004 WL 2403823 (D. Or. Oct. 26, 2004). Indeed, it has been widely held that paperwork requirements place little burden on inmates and are reasonably related to penological interests. *See, e.g., Resnick v. Adams*, 348 F.3d 763, 768-71 (9th Cir. 2003); *Stavenjord v. Corrections Corp. of America*, 2007 WL 215816 at *5 (D. Ariz. Jan. 26, 2007); *Cole v. Artuz*, 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999). As the Second Circuit reasoned in a similar context:

> Registration of religious affiliation . . . entails only a modest act of commitment by the inmate, while serving several legitimate penological interests. By registering, the inmate formally declares his religious

8

> affiliation. This has significance because prison officials are not required to accommodate an inmate's religious demands without regard to whether or not the inmate is actually a member of the religion. *See, e.g., Farid v. Smith*, 850 F.2d 917, 926 (2d Cir. 1988) (summary judgment appropriate where inmate failed to prove that he sincerely held any religious belief mandating use of Tarot cards).
>
> Registration eliminates speculation and guesswork on the part of prison officials and makes it less likely that a prisoner will manipulate the system by asserting various religions at different times. . . . Registration puts the institution on notice that certain religious accommodations will likely be sought and thereby provides the institution with time to consider if and how to implement them. This, in turn, makes such accommodations more likely and thereby reduces the circumstances in which judicial intervention will be needed. In short, registration places, at most, a slight burden on an inmate's right to religious freedom while serving as an important and beneficial 'bright line' that enables prison officials to ascertain the seriousness of the inmate's religious commitment and respond accordingly.

*Jackson-Bey v. Hanslmaier*, 115 F.3d 1091, 1096-97 (2d Cir. 1997); *see also id.* at 1096 ("[R]easonable limitations on the accommodation of religious practices necessary to achieve [legitimate penological] objectives are permitted.  Registration is one such limitation.").

McMichael's allegations go beyond the DOC's written records, claiming that he told MVRCF officials of his need for a Muslim diet prior to January 10, 2009.  He first contends that during his admission to MVRCF, he informed CO Rosario of his dietary needs.  Rosario, however, is not a defendant, and there is no record evidence of Rosario relaying that information to any other officials at MVRCF.  Nor does McMichael focus his claims on his alleged communication with CO Rosario, instead stating in his opposition memorandum that "Mr. Phil Fernandez is the reason why I did not get the religious diet muslim meal."  (Doc. 87 at 5.)  The Court should therefore find that McMichael's alleged

conversation with CO Rosario is not a basis for liability at this time.[5]

With respect to Defendant Fernandez, McMichael claims that he spoke with Fernandez on several occasions about his need for a religious diet. As discussed above, and when viewing the facts in a light most favorable to the non-moving party, some of those conversations may have taken place prior to McMichael's first written complaint on January 10, 2009, and McMichael specifically references a January 12, 2009 conversation in his verified Complaint. McMichael asserts in his sworn statement of facts that in each instance, Fernandez would respond that "you are getting the no pork muslim diet and walk away." (Doc. 87-1 at 2.) In his opposition memorandum, he similarly claims that Fernandez would assure him that he would "look into it" and then "walk away." (Doc. 87 at 8.) At the conclusion of the January 12, 2009 conversation, Fernandez allegedly told McMichael that he would try to contact an Imam.

Defendants contend that although McMichael allegedly spoke with Fernandez several times, and even submitted written complaints and grievances, "he did not clearly specify the nature of the food he desired. Thus any delay is primarily attributable to McMichael himself, rather than the Department." (Doc. 83 at 7.) Strictly speaking, these claims are supported by the record, as McMichael has not disputed the assertion that he first informed Fernandez of the need for Halal meats on February 4, 2009. McMichael does allege, however, that on January 12, 2009 he informed Fernandez of the need for food

---

[5] Defendants speculate that McMichael's allegedly disruptive conduct during the intake process at MVRCF "could explain why McMichael's religious diet request was not discovered during his intake at MVRCF," and that at most, his "claims amount to no more than negligence, which is not actionable under 42 U.S.C.A. § 1983." (Doc. 83 at 8.) Because the record regarding McMichael's intake at MVRCF has not been fully developed, and since the officers involved in the intake process have not been named as Defendants, the Court should decline to rule on the basis of such speculation.

10

that had been prepared with utensils other than those used in cooking pork.

To the extent that Fernandez may have been aware of McMichael's dissatisfaction with the food being provided prior to February 4, 2009, the fundamental question is whether his alleged response was unconstitutional. In other words, did Fernandez's failure to provide something different, prior to when McMichael specifically designated Halal meats, violate McMichael's constitutional rights?

Fernandez claims that based upon his experience at the time, the no-pork diet was acceptable. McMichael counters that because DOC directives differentiated between a vegetarian diet and a religious diet, Fernandez should have known that a pork-free diet was inadequate. (Doc. 87 at 4, 8.) Defendants have submitted the most relevant directive to the Court, and it makes no specific reference to Muslim diets, Halal meats, or the distinction between a "no pork" diet and foods that are acceptable for a Muslim meal. (Doc. 83-3 at 5.)[6] McMichael's reliance upon the DOC's directive is therefore misplaced.

Defendants further argue that the question of whether a Muslim meal requires Halal meats "is a matter of religious doctrine, not a matter of empirical fact." (Doc. 90 at 2.) Neither party has submitted evidence that would either establish or dispel the claim that Halal meats are a necessary part of a Muslim diet. In similar cases, however, numerous courts have found that Halal meats are not required to satisfy the dietary needs of Muslim inmates. *See Williams v. Morton*, 343 F.3d 212, 219 (3d Cir. 2003) (holding that prisoner does not state First Amendment violation if he is denied Halal meat but provided with

---

[6] The DOC's Religious Observances directive, also cited by McMichael, is equally silent as to the distinction between a Muslim diet and a no-pork diet. *See* http://www.doc.state.vt.us/about/policies/rpd/380-01-religious-observance.

11

vegetarian meals and his religious activities are not otherwise infringed); *DeBlasio v. Rock*, 2011 WL 4478515, at *20 (N.D.N.Y. Sept. 26, 2011) ("Courts have consistently held that . . . a strictly Halal diet is not required."); *Muhammad v. Warithu-Deen Umar*, 98 F. Supp. 2d 337, 343-44 (W.D.N.Y. 2000) (collecting cases).

Furthermore, if free exercise claims are truly to be judged according to a reasonableness standard, *see O'Lone*, 482 U.S. at 349, the record at summary judgment favors Defendants. The undisputed evidence is that McMichael and Fernandez spoke on several occasions about the need for a Muslim meal. Viewing the facts in light most favorable to McMichael, Fernandez was even made aware that the food being provided was not satisfactory. When reference was made to the need for special utensils, Fernandez reportedly tried to contact an Imam. According to the grievance responses, that effort was unsuccessful. The need for Halal meats was not identified until February 4, 2009, and within one day of that conversation, Halal meats had been ordered.

Finally, the Supreme Court has cautioned that "[c]ourts are ill equipped to deal with the increasingly urgent problems of prison administration, . . . [and it is] not wise for [a judge] to second-guess the expert administrators on matters on which they are better informed." *Bell v. Wolfish*, 441 U.S. 520, 531 (1979) (citation omitted). Fernandez believed that a "no pork" diet satisfied the requirements of a Muslim diet. McMichael claims that he tried to correct this perception, specifically during Fernandez's "walk through" of the prison unit. (Doc. 87 at 8.) Fernandez informed McMichael that he would try to access an Imam, and ultimately took corrective action shortly after he received McMichael's formal papers. While the Court may certainly review the constitutionality

12

of Fernandez's conduct, it must avoid second-guessing an administrator's handling of a prisoner's demands, particularly when there was a protocol for issuing religious diets requests via written requests.

As discussed above, the requirement of written requests for religious accommodations is related to legitimate penological concerns. When there are delays resulting from processing such requests, courts have generally held that such delays do not violate the First Amendment. *See, e.g., Tapp v. Stanley*, 2008 WL 4934592, at *7-*9 (W.D.N.Y. Nov. 17, 2008) (holding that seventy-seven day delay in granting request for kosher meals did not violate First Amendment where prison required completion of request forms, sought opinion from rabbi as to inmate's conversion to Judaism, and processed second inmate request after rabbi rejected conversion); *McCormack v. Myers*, 2007 WL 1704905, at *4 (D.S.C. June 12, 2007) (finding no constitutional violation where delay in processing inmate's request for kosher meals resulted in him not receiving kosher meals for two and a half months: "The court agrees with the defendants that the plaintiff has failed to establish a claim that rises to the level of a constitutional deprivation with regard to his temporary delay in obtaining kosher meals at the detention center.").

Here, the time span from McMichael's formal, written religious diet request to Fernandez's written response on February 5, 2009 was far shorter than in the cases cited immediately above. Moreover, the record indicates that Fernandez initially made efforts to accommodate McMichael's requests by seeking out an Imam, even when his personal experience told him that the "no pork" diet was adequate for Muslim inmates. Ultimately, McMichael's request was granted, and special Halal meats were ordered. In light of these

13

facts, the Court should find as a matter of law that Fernandez did not violate McMichael's First Amendment rights.

## III.  Fourteenth Amendment Claim

McMichael's summary judgment filings make reference to a Fourteenth Amendment claim, without identifying any specific theory under that Amendment. Reading the Complaint liberally, and in light of McMichael's repeated references to his status as a pretrial detainee, the Court should view his claim as seeking relief under the Due Process Clause of the Fourteenth Amendment.  *See Caiozzo v. Korman*, 581 F.3d 63, 69 (2d Cir. 2009).

It has been held that because a pretrial detainee has not been "convicted," the proper inquiry is whether the conditions of confinement amount to punishment under the Due Process Clause, not whether the "punishment" is cruel and unusual under the Eighth Amendment.  *See Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979) (contrasting sentenced prisoners with pretrial detainees).  "Not every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense. . . ."  *Id.* at 535.  In this case, there is no indication that response to McMichael's requests for a special diet was in any way punitive.  In fact, McMichael does offer any facts to support such a conclusion. Defendants are therefore entitled to summary judgment on this claim.[7]

---

[7]  If, as the Court discussed in its previous summary judgment ruling, *see McMichael v. Pallito*, 2011 WL 1135341, at *7 (D. Vt. Jan. 27, 2011), an Eighth Amendment standard applies, there is also no evidence that McMichael was not provided "nutritionally adequate food" or that his food was "prepared and served under conditions [that would] present an immediate danger to [his] health and well being . . . ." *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983).

14

### IV. Other Defendants

The religious diet claim in the Complaint (Count III) names other Defendants in addition to Fernandez. (Doc. 4 at 5.) McMichael also makes reference to some of these Defendants in his summary judgment papers. Specifically, he claims that Barbara Lester, as food service supervisor, was familiar with the DOC directives pertaining to religious diets. He also alleges that Jay Simons, then-Superintendent at MVRCF, stated in his discovery responses that "he always follow[s] rule[s] and policy procedures for religious diets." (Doc. 87 at 4-5.)

As discussed previously, the directives in place at that time did not address the need for special meats as part of a Muslim diet. Moreover, there is no evidence in the record to suggest that these Defendants had notice of McMichael's complaints. Pursuant to the Court's previous summary judgment decision, Defendants Pallito and Kupec have been dismissed for lack of personal involvement. *McMichael*, 2011 WL 1135341, at \*6. Accordingly, McMichael's religious diet claims should be DISMISSED with respect to each Defendant (Pallito, Kupec, Simons, Fernandez and Lester) named in Count III of the Complaint.

### V. McMichael's Motion to Compel

Also pending before the Court is McMichael's motion to compel discovery. McMichael appears to have served Defendants' counsel with several documents entitled "notice of motion to take written deposition." (Docs. 70-1, 71-1, 72-1, 73-1, 74.) Attached to the notices are a series of deposition questions to be asked of Defendants Fernandez (Doc. 70-2, 71-2), Simons (Docs. 72-2 and 73-2), and Lester (Doc. 74-2).

15

There is no indication on the docket that Defendants responded to McMichael's requested discovery.

Without ruling on whether Defendants should have provided responses, or whether McMichael's motion to compel meets the requirements of this Court's Local Rules, the Court has reviewed the requested discovery and finds that the motion to compel is moot. Nothing in McMichael's proposed questions to Fernandez, Simons or Lester would shed additional light on the issues before the Court at summary judgment. To the extent that answers might have been relevant to the Court's current considerations, those questions have largely been answered by the parties' affidavits.

McMichael also appears to claim that he was not provided copies of the relevant DOC directives. (Doc. 91-1 at 1.) Regardless of whether those directives were provided in discovery, the Court has reviewed them and has fully considered their impact on the parties' summary judgment arguments. The motion to compel is therefore DENIED as moot.

## Conclusion

For the reasons set forth above, I recommend that Defendants' motion for summary judgment (Doc. 83) be GRANTED. To the extent that McMichael's opposition memorandum (Doc. 87) is an opposing motion, I recommend that it be DENIED, and that this case be DISMISSED. McMichael's motion to compel (Doc. 84) is DENIED as moot.

Dated at Burlington, in the District of Vermont, this 24th day of October, 2011.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2), 6(a), 6(d); L.R. 72(c).   Failure to timely file such objections operates as a waiver of the right to appellate review of the District Court's adoption of such Report and Recommendation.   *See* Fed. R. Civ. P. 72(a); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).